We can call the second case. Consolidated Case 10-0088 and 10-2005 Illinois School District v. St. Charles Community Unit Alright, I think everybody is familiar with how we proceed. We'll ask the counsel for the appellant to step forward, introduce yourself, and you can begin. Your Honor, I do have one question. If there is a cross-appeal, would you prefer to not address the cross-appeal in the opening or save it for rebuttal? You can certainly save it for rebuttal. I just didn't want to wager anything by not addressing it in the initial hearing. But if you should have extra time, which I don't think you will, but you can do it on direct. Very good. Good morning, Your Honors. My name is Tim Eaton and I represent the appellant at the Illinois School District Association. Your Honor, the principal issue in this case is whether or not the Illinois School District Agency can have equitable contribution against the district for monies that they receive from settling with three other insurers. We have a span of insurance coverage for 30 years from 1971 to 2001. There were three private insurance carriers for the last segment. It was the Illinois School District Agency. When the school district was sued, they tendered to all of the insurance carriers for their individual policies. There were independent policies for each year starting in 1971. 71 to 77, General Casual, 77 to 85 was Hartford, 85 to 95 was Indiana, 95 to 2001 was ISDA. They then reached settlements with the three commercial carriers in the fall of 2002. We were not notified of that. Prior to that time... Wait, when you say you were not notified of that, what were you not notified of? We were not notified that they were in settlement negotiations. We were not notified that they had reached settlements. So after all three had, all settlements had been reached and then we were not notified as to the amount. We, in fact, had to subpoena the insurance companies to find out what the amount was. We had entered into an agreement with Indiana that Hartford later joined on where we were going to apportion the defense costs. When they entered into the settlements, they then deselected or detendered as to the other three. So doesn't this case really turn on whether or not the district had a right to deselect or detender? Yes. And what do you have to say why they don't? The reason they do not is that if you look at the case law that has developed on this targeted tender with Cincinnati, John Burns, Bituminous, Statewide, which I know Your Honor was involved in and dissented, Kojima, in each of those cases they discussed the right to do a targeted tender when you have concurrent policies that cover the same risk. Here we had independent policies for each... That in each of those cases it was concurrent policies. Are you saying that that was a necessary condition for the ruling in those cases? That had it not been concurrent policies, the ruling in those cases would have been different? I think you have to look at each individual case, but Your Honor, generally speaking, yes. Because the only case they point to, which is this Richard Marker case out of the second district, there is absolutely no discussion in that case. Let me ask you about concurrent policies. It would seem strange to me that you could have the direct insured having a number of concurrent policies. It doesn't make sense. The primary insured only needs one policy to protect himself or itself against risk. It doesn't need multiple concurrent policies. You get concurrent policies when there is a party, such as a general contractor, who has a variety of subcontractors and he insists that he be named as an additional insured under their policies. So you have concurrent policies in that situation. So I don't see where those cases really apply in consecutive policy or why those cases that you've just tried to distinguish would not apply in consecutive cases where, consecutive policies where it's difficult, if not impossible, to decide where that apportionment, how that apportionment should be made. Your Honor, this apportionment issue arises often in environmental cases because you're dealing with a period of coverage over a period of years. So do you have concurrent policies in environmental cases? No. You have individual policies for each year. And during this 30-year time period, if we were going to pro-rate who was responsible for what, you would look at the number of years that each policyholder, excuse me, each insurance company had time on the risk is the term that they use. Yes. Maybe you could explain to the panel, you know, how mold is a peculiar type of a risk. Well, it is the type of risk where once it starts, it's not like a discrete trauma or injury. It would be something that would span a period of time. So, for example, It's just like every other environmental problem, isn't it? I mean, it's like the lungs in coal miners, you never know when it started, asbestos. So we understand the nature of that problem. But the question I have is why you seem to be looking for a rule that says that when you have consecutive policies in equity, there should be a sharing of the expenses when you can't decide whose policy really covered the injury. That's exactly what I'm saying. And the question is whether the courts can, in fact, establish such a rule, or maybe even before that, whether we have established such a rule. And I don't know that we I'm not sure that we have. It seems like a good rule. But I'm not sure that the courts are in a position to establish such a rule. Your Honor, if you look at the reasoning for allowing an insurer to do a targeted tender, the courts have said because they don't necessarily want to turn to a particular policy where the rates may go up, they don't want to turn to a policy where they would have an extended loss history, or their fear of having their policy canceled. So they have the opportunity then to target another insurer for those reasons. Those don't apply in a consecutive policy situation. Those policies are gone. I agree with those are some of the reasons. But I don't think they're exclusively the reasons because when you have a general contractor and you have a subcontractor, multiple subcontractors, sometimes liability can lie all over the place, and including the general contractor. And so it's not a question of, you know, which policy really covers. It's a question of the person that's paying the cost should decide which policy they're going to target. Well, what we have here, too, which is an added wrinkle, every one of those cases talk about the insured's right to forego making a claim against those other policies and target the one policy they want. Here, the district did not forego anything. It targeted them, settled with them for the amount of money that they thought would cover the risk, and then deselected them. So we're in a little different situation. Well, there is really no cases, there was three, at least I'm not sure, where this kind of scenario happened, where there was a target and then a withdrawal. I mean, are you aware of any other case where that has occurred? No. And as a matter of fact, if you look again at the reasoning behind why the Supreme Court has allowed target tender, and we're one of the few states in the country where this has occurred, they allow it so the insured then can make a decision as to what's in their best interest and not target their own primary policy. For example, if it's the general contractor, I don't want to go against my primary, I'm going to go against the additional insurance position I have against one of the subs. But I have not seen a case where the district in this case or the insured has reaped the benefit of settling and then deselected in exchange. If you look at that contract, if we cite, it specifically says we will deselect if you pay us X dollars, and that's what they did. Then they went against us. And as you know, we're a risk-sharing pool of taxpayer funds with various school districts, and it did not seem equitable to us. So at the very least, if this is not a valid tender, then we would have the right to go back against the district for equitable contribution for what they receive from the insurance carrier. Well, on that note, opposing counsel has suggested that the settlement here in the amount of some $660,000, is that approximately what it was with the three? Yes, it was. But the actual expenses and costs that the district ended up paying for, they suggest were $9 million and another couple of million? They say that this amount, that they're not getting a double recovery, that they have had to expend several times over the amount sought or that was received in the settlement with the three other companies. I'd be happy to address that. First of all, the $9 million number, that dealt with remediation costs for the school. It did not deal with defense costs because of litigation. And that's the coverage we're talking about here. Well, let me ask you, is that the coverage we're talking about with regards to the private carriers? I understand that's the coverage we're talking about with ISDA, but is that the coverage, is that really the coverage that we're talking about with the private carriers? Yes. Exclusively? I mean, there was no remediation coverage provided? No. As a matter of fact, the counterclaim that was filed by the district, Count 1, Judge Arnold specifically found that there was no coverage for the remediation. And so that issue was not in play. Now, she ruled later. That's just ISDA. But as to the policies, they did not cover remediation. So that $9 million is out. The other thing that the district says is that once we receive this $660,000, well, we used that over here for remediation. We didn't use this for defense costs. Well, our Illinois Supreme Court has said in Patton v. Carbondale Clinic that where you're going to have a settlement and where there's going to be a potential party seeking a set-off, you have to allocate it. So you have to specify this much is for remediation costs, this much is for defense costs, and then they can apply the set-off. Where you don't do it, you do it at your own risk. And so they're saying we're trying to manipulate how those monies were spent. No, we're not. They didn't allocate it. Therefore, all of that can be viewed as defense costs, and that works in our favor in terms of seeking the set-off for RATA. So how would that work? Would we remand it to the circuit court to allow the division between remediation and defense of that $660,000, or how? I think what would happen, Your Honor, and what we're asking for, is that this be remanded to the circuit court for her to decide what our pro-RATA share or what set-off we're entitled to. Are we entitled to a set-off for the entire $660,000? Are we entitled to a pro-RATA share for years on the risk? Because we believe that there was not an appropriate targeted tender that cuts off our right to equitable contribution. And, Your Honor, as you pointed out in your dissent statewide, and I understand it's dissent, but I thought it was well-reasoned, because what you were saying in that case is that for a targeted tender to work, you have to look at a situation where all of the policies are concurrent, are providing the same coverage for the same person, same year. And in that case, as you well know, they deselected one of the subs and then went against the additional insurance where they were listed for the other sub. And that does not put them all in the same category. That's not what Kajima is about. Kajima, I understand, dealt with situations where you're talking about primary versus access. But the idea behind it was you have to have everyone on the same level field, and then you can pick and choose. Well, let me bring up Kajima. Yes. Because we are an intermediate court. Do you believe that we could rule in the fashion that you're asking us to rule without creating a conflict with Kajima? I absolutely do, because Kajima uses the word concurrent policies. And it does not have to be. But, you know, I don't know that we should necessarily rely on distinguishing Supreme Court cases, because we might rely on distinguishing our fellow appellate court decisions. But to say that, well, this decision by the Supreme Court doesn't really control our decision here seems, you know, that we're not giving sufficient guidance or we're not giving sufficient deference to the Supreme Court. The Supreme Court wants to establish a rule that doesn't exist right now. It certainly can, but I'm not sure that we should be doing that ourselves. Your Honor, if I may respond. I believe Kajima controls the situation and says concurrent. I think if you held that you could do it in a context other than concurrent, you were outside of Kajima. Are we extending Kajima in that sense? No, I think you would be overruling Kajima if you said it applied to consecutive. I think you'd be totally consistent with Kajima if you said it applied only to concurrent, which is what our argument is and what our argument was to Judge Arnold and the decision that had just come out. So I think in order for the tender to be valid, it had to be concurrent policies covering the same year, same time span, and then they can do a targeted tender, because then the reasoning for it makes sense. Mr. Eaton, your service in appellate cases is well-known. And I have to bring this out because of your service in these cases. Are you familiar with Supreme Court Rule 341 regarding footnotes? Yes. And footnotes should be rarely used or sparingly used. Yes. And I have here an indication that there were 34 single-spaced footnotes. Right. Oh, excuse me. That's the district's. That's what? That's the district's responsive brief, not yours. I was being fast. My apologies. My apologies. But I believe that there might have been a couple things that your brief also, well, never mind. If I fail to use it sparingly, I apologize. No. But I do know that. All right. So I know I'll have the opportunity for rebuttal, and I'll address the cross-appeal at that point. But we believe that where you have a situation here where the public schools have all pulled their funds, they're trying to reach what is the most equitable remedy in terms of who should pay for what, and you're dealing with consecutive insurance cares for the years, that the Target Attendant Rule was not intended for this purpose, and that we should have a right to go against a district who stepped into the shoes of those insurance carers by settling. But just before you depart, Mr. Eaton, I just want to be clear. I want to clarify it for my own purposes. Yes. The other policies only provided defense expenses and not or they were identical. They were on all fours with the policy that ISDA issued to the district. When you use the word all fours, I'm going to be careful. But yes, they only covered defense costs. I don't know about all the other provisions. Well, let's say they did cover other provisions. Wouldn't the district at that point have a right to tender their costs, tender the defense to them, and then detender if they're willing to come up with remediation contributions? Well, the answer is ultimately it turned out, if you look at the policies, that there was no remediation responsibility. These were for litigation. So on that point, it's clear they're all the same. All right. We'll let you know when. Okay. Thank you. May it please the Court, my name is Scott Reed. I represent the St. Charles Community Unit School District 303, and at counsel table with me is Mike Dugan, who used to be the general counsel of the district at the time all this took place. Good morning, Mr. Reed. Why don't we dispense with it? Why don't we get to that procedural Supreme Court rule? Let's get to that. I apologize for the excessive footnotes in the opening brief, and I would like to say that I have learned my lesson by the time I got to the reply brief, and I believe there were only three. Judge Rizzi always used to write about that when he was on the appellate court as well. You know, it's not just the number. There's also a rule that says no substantive arguments can be advanced in footnotes. And, in fact, there's case law, and there's one from Justice Burke, where the footnotes were all stricken. And to the extent that your footnotes don't violate the other rule as well, then there should be no reason why we shouldn't strike all your footnotes, unless they're violating the other rule as well. That's obviously subject to the court's discretion. But I'd like to address the principle argument, and I think following on to Judge Garcia's questioning, I think this is really a lot like an environmental case. Basically, it's an indoor air quality case, and many of the same principles apply. The question is, where you have multiple primary policies triggered, can the insured, where it has suffered a loss, a compensable loss, clearly this is a covered claim, and we have incurred costs. Basically, one thing that I didn't hear very much about in Mr. Eden's argument was the fact that we did spend $2.1 million at the request and at the suggestion of defense counsel. This was an extensive investigation into the causes and the extent of mold contamination at the district. And the reason it was undertaken at this high level is so that we could defend what the district did when it came time to litigate the case. Fortunately, it ended up getting settled, but we incurred a lot of costs. Let's go back to Justice McBride's point, though. When you say that the district should be able to do what it did, what case reflects similar actions by another insured like this? Well, there are a couple of cases. I think there are cases that reflect deactivation of tender, and I was looking through. No one questions that point, that the insured has a right to do that. And the case that talks about deactivating the tender to a prior year carrier was obviously Richard Marker v. Pekin. Is that the only one that talks about deactivation? No, that one does talk about deactivation. There may be others, but that one definitely does because two consecutive carriers were targeted, and even after the case was settled, the insured deactivated the tender. And the second insurer said, look, I'm being prejudiced here. I'm being forced to bear the entire load. They made basically the same argument that ISDA is making here in the second district. And we took a look at this because obviously the carriers, when they came to me and said, we really want to settle, in context what happened is we presented all the carriers that accepted the tender defense. Now, some did not. Some said, go away. Some said, go away, but we'll negotiate. And we presented the carriers that accepted the defense with a complete set of the bills for what we did in the investigative world. And some came back to us. So right there, let me ask you this. So to the extent that you received settlements from these insurance companies, you received settlements to cover what? They were unallocated, and they were – they could only be filed by – Unallocated suggests that you had broad coverage, and it could go to other things. And the question is whether it could be unallocated to expert witnesses. Is that what you're saying versus attorneys? Or what do you mean by unallocated? Unallocated as to defense or indemnity. The prior coverage and all the coverage was commercial general liability coverage, which covered both, and this is in answering the question previously. It does cover defense expenses and indemnity. The Illinois Supreme Court is somewhat aggressively pro-insured on the question of whether things such as cleanup costs are covered indemnity. There's a case called Home Insurance versus Silco. And the Illinois Supreme Court said that where one is cleaning up, pursuant to an order of regulator, and we made the argument. This was a contested issue in front of Judge Arnold. We said we think that even the remediation costs ought to be covered, that's the $9 million, because we incurred them because the regional superintendent of schools literally said in his deposition, I close the school now. So we responded by remediating. We think that that's a contested issue. Obviously, the other carriers disagreed. We had back and forth. So when I say that these settlements were unallocated and they released the other carriers both for remediation costs, and some of them specifically say remediation costs, that's how they were unallocated. They released those carriers for the potential responsibility for the $9 million in remediation costs plus the $2 million in investigative costs. Let's go on to the de-tendering. Going back to Justice McBride's point, is there a case that says or that approves de-tendering after the insured gets a settlement from the insurance company that was initially tendered to? I think this was what the trial court said, is that there is no case out there that says that uncompensated tenders are improper. And this is what was argued first off. Uncompensated tenders are the only ones that are proper. I may have switched negative in here. Compensated tenders are not improper. The court said there's no authority that says your tender must be done gratuitously or it's improper. Are there good policy reasons to question compensated de-tendering? No. In fact, I think since the general policy, especially in complicated environmental insurance cases like this, by settling and de-acting, we had a block of costs that we resolved by settlement with the carriers rather than put the dispute into the court system with the traditional multi-party thing with 20 lawyers. I hate to keep interrupting, but it just dawned on me regarding tendering or de-tendering when you have concurrent policies. I picked the street and brought up one reason is to prevent future premium hikes. And here it seems to me that the district can de-tender after settling with these other insurance companies without any kind of impact on the district whatsoever. The district isn't going to suffer any consequences by settling. It has every incentive to settle even for, let's say, $10,000. When other insurance companies have settled for 100, 200, I forget what the other ones were, but the $10,000 settlement sort of struck. What these settlements were, the underlying suit is a class action. It alleged the high school opened in 1971. The class action alleged that students who were there from 1986 to 2001 when the suit was filed suffered from mold infestation. When the carriers looked at it, those that were farthest from the present, like 1971, would you be able to prove that? Was that really a serious, serious exposure? Well, then maybe we should go back to Justice Gordon's question. How did mold come up? If mold came up in 1971 when the building was constructed in the course of poor construction or faulty construction or failure to seal properly, whatever the reason, if there's a connection between 1971 and the building of the school and the mold that was discovered in 2005 or whenever it was, then why should they be in a different position than those later insurance companies? Well, the question is how strong the claim is as we recede farther and farther. Doesn't that go to Justice Gordon's question, though? Where does mold come from? It's a very good question. Unfortunately, as a coverage lawyer, I have not had to delve into it that greatly. When the carriers said, look, we were only on the risk for a couple of years in the early 70s, I don't think they can prove a class action going this far. Here's $10,000 to go away. That's sort of a gift. When we're facing $2 million in investigative costs, setting aside the mediation costs, we're happy to get that. And I think this sort of thing should be encouraged because we narrowed the issues. But in this case, we don't have concurrent policies. We have consecutive policies. We have 30 years of consecutive policies for which we paid a premium, and we should be entitled, and I think Judge Garcia asked the question, the party that paid the premiums over those 30 years should be the party that gets to decide. It's really kind of a free market thing. The party should get to decide how it wants to reap the benefits of what it pays. But is there any difference between a tender when you have multiple policies applying for the same period of time with different insurers as opposed to a situation where you have a tender of policies that are not concurrent and covering different time periods? I mean, there is a difference there. And what case has this kind of time frame that we're talking about where the insurers are from, you know, 10 years and 10 years and 10 years? In terms of the Illinois Targeted Tender Rule, which, as Ms. Reed correctly points out, is a relatively limited, Judge Garcia knows from the dissent in the Houston general case, it's something that's kind of unusual. I've not seen a pure environmental case like this. The one that I have, which is my example, and the one that we based our decision on in deactivating the tender was Beacon v. Richard Marker. That was not an environmental case. I've not seen a targeted tender case in the environmental context. But I think it absolutely fits there, and that's our position. Mr. Reed, regarding that free market argument, and I certainly suggest it as much, but when you're in a court of equity, rules apply. And maybe different rules should apply, or a court of equity looks at what's the fair thing to do and not necessarily simply what is your free market right to do. And maybe there should be policies that say when you have a variety of insurance companies, when you want to tender your policy, your defense to the company that you know has the last responsibility and probably the biggest responsibility because they're your current insurer, that the rules should require more than what they would require in another context. I can address that in two ways, Robert. First off, I think that there are rules that are in place. There are a couple limits that the court has on our ability to deactivate the tender or to not tender in the first place. But you didn't do that. It wasn't that you didn't tender. Correct. You did. Deactivation. And then you deactivated. We did. I don't think you should be suggesting that there was no, you know, as if there was no tender. No, I'm not suggesting. We didn't. But there are two limits on the ability either to deactivate or to target tender in the first place. One is that you can't make a double recovery. And I think that's pretty clear. If we were to have gotten more than what we paid, that would be improper. I think the other situation, which is exemplified by Kojima and exemplified by Gerber City. I think you're right there regarding the double recovery. Because let's say you didn't de-tender anyone. And let's say IDSA took charge and they prosecuted everything to the end and they incurred these expenses. And then they negotiated with the other insurance companies. Would it be fair to say that although double recovery, you know, had you received the funds you wouldn't be doubling recovery. It certainly is a difference between your receiving those funds and ISDA not having to bear the full cost of defense. This is why this is an unusual case because we as the insured went out of pocket and paid for the investigative expenses. That's a highly unusual situation. And that's what enabled this deal. That was a situation that you were pretty much forced to do. And if later on you felt that someone should owe that to you, you should be entitled to reimbursement, then you would litigate that. But if you felt that you could settle for more or the settlement wasn't fair, then you would have litigated. That's exactly right. If we did not have a fair settlement, we would have litigated, but we were able to reach an accommodation, and I think we should be encouraged from doing that. I know that my time is getting a little short, so I'd very briefly like to address the cross appeal, which is the reimbursement. I don't think the cross appeal is really a key part. Let me ask you about Kojima. Sure. What about Mr. Eaton said that Kojima, that if we were to rule, if we were to affirm, we would in fact be going against the rule in Kojima? Absolutely not, because the rule in Kojima, and the court simply said, we decline to extend the targeted tender doctrine to require one insurer to vertically exhaust its primary and excess coverage limits before all primary insurance available to the insurer has been exhausted. We don't have any excess policies here. We've got 30 years of consecutive primary coverage, and as to an incident of mold or mold infestation occurring in a particular year, that carrier's policy is primary. So, no, it's entirely, there are chips passing in the night. Kojima does not have any effect here. And so the best case that you rely on for affirming is? You mentioned Pekin. Pekin versus Richard Marker. The targeted tender doesn't violate the other insurance clause, John Burns versus Indiana. Maybe I should have phrased it this way. What do you think, which case do you cite that is the closest to the situation we have here? Because as you said, it's somewhat of a unique situation. You know, it's basically asking what's closer to black, purple, blue, or green. I mean, none of them are terribly, terribly close. I just wanted to be sure that that was your feeling as well. But I am a big Pekin versus Richard Marker fan in this context. All right. Okay. Thank you very much. Appreciate it. And just so it's clear, I understand that the cross appeal is really based on what was a stipulated trial. That's correct. It's a different standard and presents a different question. In ten seconds, the issue is that the trial court applied the voluntary payments clause of ISDA's general liability policy to post-tender conduct, and no Illinois case has ever applied it. All right.  All right. Thank you. Mr. Eaton, you have a few minutes. Your Honor, quoting from Kojima, we find the better rule is it's set forth by the appellate court that targeted tender can be applied to circumstances where concurrent primary insurance coverage exists. That's their words, and those are the words that the Supreme Court also said in John Burns. So we have a situation here where... So what do we do with Marker, Pekin? In the first two lines of the Marker decision, it states what the coverage was for each year, and it says that they were covered. It never uses the word consecutive all the way through that opinion. So the issue really wasn't... It wasn't addressed. Yeah. And it's been cited repeatedly in other cases, but never for the issue of consecutive coverage. So as far as I'm concerned, Marker is not a case that has decided the issue. I think this Court will have the opportunity to say that, pursuant to Kojima and the other cases the Supreme Court has held, that the policies must be concurrent. You can't apply it to consecutive. And therefore, if you can't apply it to consecutive, then we don't lose our equitable right to share those costs with typical and most environmental cases like Alport Marine, which we cited, which is another period of time, where they said the insurer can't manipulate coverage by not being insured during different years. It's a portion. It's parata. It's set up. So we would respectfully ask that this Court find that a targeted tender cannot be made under these circumstances where it's concurrent, and therefore we would have an equitable right to go against the district. All right. Thank you very much. Thank you very much. Thank everyone involved in this case. We're going to take a very brief recess.